631 P.2d 187

**STATE of Idaho, Plaintiff-Respondent,**

v.

**David Allen OSBORN,
Defendant-Appellant.**

No. 13400.

Supreme Court of Idaho.

July 9, 1981.

Gaylen L. Box of McDermott & McDermott, Pocatello, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Deputy Atty. Gen., Boise, for plaintiff-respondent.

McFADDEN, Justice.

## I Procedural background

The appellant, David Allen Osborn, was arrested and charged with the October 31, 1978, murder of Charlotte Christine Carl. Appellant was arraigned before the magistrate division of the Sixth Judicial District on November 29, 1978 on the charge of first degree murder and a public defender was appointed. On December 7, a preliminary hearing was held and appellant was bound over for trial. Before Sixth District Judge Arthur Oliver on December 11, appellant pled not guilty and filed a notice of intent to rely upon mental disease or defect as an affirmative defense. An examining psychiatrist was appointed by the court at this time. I.C. § 18–211.

Following discovery and argument on various motions not in issue here, appellant, on May 21, 1979, withdrew his plea of not guilty and entered a plea of guilty to the charge of first degree murder. The court, after assuring the knowing and voluntary nature of the plea, ordered a presentence investigation and scheduled an aggravation-mitigation hearing. I.C. § 19–2515. This hearing was held on June 21, 1979, and the matter of sentencing was taken under advisement. On June 29, a memorandum decision, findings of fact, and conclusions of law were issued by the court, and appellant was sentenced to death.

Appellant filed motions for correction or reduction of sentence, which were denied by the district court. Appellant also filed a petition for review of the sentence and a notice of appeal to this court. The matter is before us on a dual basis: under the mandatory review procedure set forth in I.C. § 19–2827 and under the appeal brought by appellant.

## II Factual background

No trial having taken place, the following facts are established by and taken from the record of the preliminary hearing.

Appellant and the murder victim were both employed at a Pocatello cafe, worked together, and appeared to get along well. They were seen together in a room at the Pocatello Holiday Inn on October 30, 1978 by an employee of the hotel who delivered a room service order. This employee testified that appellant instructed the victim to sign his name to the tab and spelled out "Osborn" for her.

The next evening, October 31, appellant was stopped by a Pocatello police officer for driving in an inattentive manner. The officer felt that appellant was not sufficiently intoxicated to be arrested, but he did ask the female passenger in the vehicle, whom appellant called Chris, to drive. Later that night, Christine Carl's partially clothed body was found along a road on the outskirts of Pocatello. She had been shot three times in the head, once in the shoulder, and once in the abdomen. Her face showed extensive bruising on the left side, and her nose was fractured. The pathologist who performed the autopsy believed the bullet wound behind the victim's ear was a close contact wound while the other head wounds were probably distance wounds although he stated it was possible that they could have been incurred within eighteen inches of the firearm. The pathologist stated that the large amount of blood loss would indicate that the victim's nose had been broken prior to her being shot.

He also stated his opinion that the beating could have occurred prior to the shooting, but noted that this was conjectural as the same bruising could have occurred had the beating occurred simultaneously with the shooting.

About 10:30 that same evening, appellant, driving Christine Carl's car, arrived at the home of an acquaintance. Witnesses at that home testified that Osborn had a pistol in his possession and blood on his vest, chest and boots; that appellant appeared to be acting "weird," though the people in the house could not tell if he was drunk or under the influence of drugs; that appellant stated that he had shot "Chris," and within an hour's time stated that he had buried her in the mountains and that he had placed her body on some railroad tracks; that appellant also stated that the victim had threatened to call the police and turn him in for robbery and that was why he shot her. Two occupants of the house were requested by appellant to hide the car, and in doing so they observed a large amount of blood on the front seat and passenger door of the car.

Police officers later searched the premises and found a dismantled .22 caliber nine-shot revolver. This revolver was at the F.B.I. laboratory in Washington at the time of the preliminary hearing, so only a photograph of it was introduced into evidence. An F.B.I. report stated that due to similarity of rifling marks, the gun in its possession could have been the murder weapon. The report also stated that absent some of the missing parts, the cylinder of the gun had to be manually rotated before the following round could be fired. A Mr. Sullinger testified that in October, 1978, he sold appellant a revolver of the type discovered. He noted that it was then missing a part and that the cylinder had to be revolved by hand between shots before a live round would be positioned.

The psychiatrist who was appointed following appellant's earlier notice of intent to rely upon a defense of mental disease or defect under I.C. § 18–211 reported to the court that appellant had a history of anti-social behavior and alcohol/polydrug abuse. He also noted that appellant claimed to have been on drugs and alcohol at the time of the crime. As to appellant's claim that he remembered nothing of the events of that evening, the psychiatrist stated that in his opinion the claim of amnesia was not genuine, although he noted that it was impossible to be sure. It was also mentioned that appellant had several episodes of amnesia associated with intoxication and violent behavior.

## III District court proceedings

After submission of a presentence report, an aggravation-mitigation hearing was held. I.C. § 19–2515. At that hearing, neither prosecution nor defense called any witnesses. The state advised the court that "because I think we do have a—a good record of what transpired in the preliminary hearing instead of calling witnesses today, [I choose] to rely on the testimony presented at the preliminary hearing . . . ." Similarly, appellant's counsel relied upon the facts brought forth in the preliminary hearing and in the reports to the court, and called no additional witnesses, although the appellant did address the court in his own behalf.

The trial court therefore had for sentencing purposes the arguments of counsel and the oral statement of appellant, the presentence investigation report, the transcript and exhibits from the preliminary hearing, and the § 18–211 examining psychiatrist's report.

The court found the following two aggravating circumstances existed beyond a reasonable doubt: (1) "that the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity," I.C. § 19–2515(f)(5), and (2) "that by the murder and the circumstances surrounding its commission, the defendant exhibited utter disregard for human life," I.C. § 19–2515(f)(6). The court also found, but only by a preponderance of the evidence, the aggravating circumstance that appellant, "by prior conduct and his conduct in the commission of the murder, has exhibited a propensity to commit murder and will probably constitute

a continuing threat to society." I.C. § 19–2515(f)(8).

In regard to mitigating factors, the court stated:

"This Court, because of the extreme burden imposed upon the sentencing judge by the statute and the offense itself, has consciously searched all the information before it hoping sincerely to find circumstances in mitigation which would overcome the circumstances of aggravation—however, such mitigating circumstances do not exist."

and:

"The Court further finds that there are no mitigating circumstances which outweigh the gravity of aggravating circumstances and which would make imposition of the death penalty unjust."

The court then concluded that, under I.C. § 19–2515, "the statutory aggravating circumstances outweigh mitigating circumstances" and sentenced appellant to death.

## IV Legal background

Prior to 1977,[1] I.C. § 18–4004 made the death penalty mandatory for those defendants convicted of first degree murder. However, in light of the opinion of the United States Supreme Court in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), which held unconstitutional a mandatory death penalty statute virtually identical to Idaho's, the legislature in 1977 amended I.C. §§ 18–4004 and 19–2515 and added § 19–2827 in an attempt to meet the Supreme Court's objections to such statutes. 1977 Sess.Laws Ch. 154, p. 390. The basic premise of *Woodson* and its companion cases, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), is that the sentencing authority must be given specific and detailed guidance to assist them in deciding whether to impose a death penalty in order to assure that the death penalty will not be imposed in an arbitrary or capricious manner. To meet this mandate the Idaho legislature enacted an amended version of I.C. § 19–2515 providing for a sentencing hearing at which all relevant information could be presented to the sentencing court; listing the aggravating circumstances which must be found in order to impose the sentence of death; providing that at least one such aggravating circumstance be found to exist beyond a reasonable doubt; and providing that the defendant shall be sentenced to death upon such a finding unless the mitigating circumstances outweigh the found aggravating circumstances. Further, the legislature provided in I.C. § 19–2827[2] for

1. Prior to 1973, I.C. § 18–4004 provided for sentences of death or life imprisonment for first degree murder. By amendment in 1973, the legislature struck the alternative of life imprisonment, 1973 Sess. Laws, Ch. 276, § 2, p. 589, thus resulting in the mandatory capital punishment status *pre-Woodson*.

2. I.C. § 19–2827, as added by 1977, ch. 154, § 5, p. 390:

"Review of death sentences—Preservation of records.—(a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Idaho. The clerk of the trial court, within ten (10) days after receiving the transcript, shall transmit the entire record and transcript to the Supreme Court of Idaho and to the attorney general together with a notice prepared by the clerk and a report prepared by the trial judge setting forth the findings required by section 19–2515(d), Idaho Code, and such other matters concerning the sentence imposed as may be required by the Supreme Court. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a narrative statement of the judgment, the offense, and punishment prescribed. The report may be in the form of a standard questionnaire prepared and supplied by the Supreme Court of Idaho.

(b) The Supreme Court of Idaho shall consider the punishment as well as any errors enumerated by way of appeal.

(c) With regard to the sentence the court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether the evidence supports the judge's finding of a statutory aggravating cir-

mandatory supreme court review of all death sentences imposed. Appellant raises numerous challenges to the sentence upon direct appeal, which contentions we consider first.

V Issues presented on appellant's appeal

A. The appellant's first contention is that the district court erred in relying upon the preliminary hearing transcript at the sentencing hearing as opposed to requiring the state to present the testimony of witnesses in open court. The record below discloses that the court at the aggravation-mitigation hearing initially offered the appellant an opportunity to change his plea of guilty, which was declined. The court then stated:

"The Court has set this time as a mitigation/aggravation hearing. I'm going to ask you, Mr. Blake [counsel for appellant], to go forward particularly with any statements, first, as to the presentence investigation, and then I'll hear any witnesses or statements you have in mitigation."

The court in effect gave appellant the first opportunity to present any material facts or information he wished at that time in whatever form he wished. After argument by Mr. Blake, wherein no witnesses were called, the court proceeded to hear the state's presentation. Mr. Pincock stated for the prosecution:

"I have chosen, Your Honor, because I think we do have a—a good record of what transpired in the preliminary hearing, instead of calling witnesses today, to rely on the testimony presented at the preliminary hearing, Your Honor. I think that there are a number of matters which the Court might address itself to in considering the sentencing, as far as aggravating circumstances are concerned."

Mr. Pincock proceeded to quote at length from various parts of the preliminary hearing record and made arguments thereon.

Mr. Blake then undertook on behalf of appellant to discuss the facts as presented by the preliminary hearing record and the presentence investigation report. The court allowed appellant to give a statement, and when the court inquired if there was anything further to be added, Mr. Blake gave a final statement. At no time did either the state or the defendant object to proceeding in this manner or present any witnesses for examination.

 Since appellant did not object to the use of the preliminary hearing record at the time, and in fact acquiesced in its use, we must initially determine whether the general rule that precludes our review of matters not objected to below [3] prohibits our consideration of this issue. We conclude that it does not.

This general rule applicable to appellate review of error is not necessarily controlling where we are statutorily required to undertake appellate review irrespective of the defendant's contentions, if any. Death is clearly a different kind of punishment from any other that may may be imposed, and I.C. § 19–2827 mandates that we examine not only the sentence but the procedure followed in imposing that sentence regard-

cumstance from among those enumerated in section 19–2515, Idaho Code, and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(d) Both the defendant and the state shall have the right to submit briefs within the time provided by the court, and to present oral argument to the court.

(e) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

(1) Affirm the sentence of death; or
(2) Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel.

(f) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration.

(g) The Supreme Court shall collect and preserve the records of all cases in which the penalty of death was imposed from and including the year 1975."

3. *State v. Garcia*, 100 Idaho 108, 110, 594 P.2d 146, 148 (1979); *State v. Watson*, 99 Idaho 694, 701, 587 P.2d 835, 842 (1978).

less of whether an appeal is even taken. This indicates to us that we may not ignore unchallenged errors. Moreover, the gravity of a sentence of death and the infrequency with which it is imposed outweighs any rationale that might be proposed to justify refusal to consider errors not objected to below.

Other jurisdictions similarly do not allow technical appellate rules to preclude a comprehensive review of those cases where a sentence of death has been imposed. *See e. g., State v. Brown*, 607 P.2d 261, 265 (Utah 1980); *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174, 179–80 (1978); *State v. Ceja*, 115 Ariz. 413, 565 P.2d 1274, 1276 (1977); *cert. den.*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977); *State v. Martin*, 243 Iowa 1323, 55 N.W.2d 258, 260–261 (1952); *Tuggle v. State*, 73 Okl.Cr. 208, 119 P.2d 857, 859 (1941). We have previously recognized as much in this state by holding that fundamental error, even absent objection at trial will be reviewed on appeal. *State v. White*, 97 Idaho 708, 714, 551 P.2d 1344, 1350 (1976), *cert. den.* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976); *State v. Haggard*, 94 Idaho 249, 251, 486 P.2d 260, 262 (1971).

■ However, while it is the conclusion of this court that we may consider the issue, we hold that the use of the preliminary hearing transcript at the sentencing/aggravation mitigation hearing in this case was not in error.

Facially, I.C. § 19–2516 provides:

"Inquiry into circumstances—Examination of Witnesses.—*The circumstances must be presented by the testimony of witnesses examined in open court*, except that when a witness is so sick or infirm as to be unable to attend, his deposition may be taken by a magistrate of the county, out of court, upon such notice to the adverse party as the court may direct. *No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court*, or a judge thereof, *in aggravation or mitigation of the punishment, except as provided in this and the preceding section*." (Emphasis added)

While this provision would seem to imply an absolute requirement of live testimony, pursuant to the last sentence therein, it must be read in light of the preceding section, I.C. § 19–2515. Subsection (c) thereof states:

"(c) In all cases in which the death penalty may be imposed, the court shall, after conviction, order a presentence investigation to be conducted according to such procedures as are prescribed by law and shall thereafter convene a sentencing hearing for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense. *At such hearing, the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation.* Should any party present aggravating or mitigating evidence which has not previously been disclosed to the opposing party or parties, the court shall, upon request, adjourn the hearing until the party desiring to do so has had a reasonable opportunity to respond to such evidence. *Evidence admitted at trial shall be considered and need not be repeated at the sentencing hearing.* Evidence offered at trial but not admitted may be repeated or amplified if necessary to complete the record." (Emphasis added)

The section speaks of the entitlement of the parties to present whatever evidence they desire at the aggravation-mitigation hearing. The ultimate decision regarding the use to be made of that opportunity clearly rests with each party. But the precise question raised by appellant is whether the live testimony mandate of I.C. § 19–2516 displaces or excludes the discretion granted to the state on how to proceed at the hearing, i. e., whether the statute absolutely requires live testimony in open court at the aggravation-mitigation hearing. We decide that it does not.

The last sentence of I.C. § 19–2516 makes it clear that we are to treat both sections as together setting forth the procedure to be followed in such hearings. The statute pro-

vides that evidence previously presented at trial need not be repeated and indeed may be amplified if desired. The parties are "entitled to present all [other] relevant evidence" they desire. The manifest intent is to place as much possible relevant information as can be provided before the sentencing court. This also serves to provide this court with as much information and as complete a record as possible for appellate review. While, admittedly, the section speaks of evidence from the prior *trial*, in light of the purpose of the statute, we see no need to read into the statute a requirement that other previously considered, relevant information from the preliminary hearing is to be excluded unless presented once again by live testimony. This is certainly true where the appellant also relied upon the information contained in the record of the preliminary hearing, as occurred here.[4]

■ This court was presented in *State v. Coutts*, 101 Idaho 110, 609 P.2d 642 (1980), with a similar argument that the provisions of I.C. § 19–2516 were absolute. In that case, the defendant claimed that certain remarks of the prosecutor during the sentencing hearing were the equivalent of unsworn evidence in violation of the provisions of the statute. After noting a split in authority among jurisdictions as to the formality required at such hearings, this court stated:

"In order to maintain a viable system of sentencing hearings, under ordinary circumstances, such hearings normally need not be encumbered with all the procedural requirements which attend a resolution of the issue of guilt or innocence. The court therefore holds that *in the absence of an explicit request for the formal hearing contemplated by I.C. § 19–2516,* the court may reach its sentencing decision by receiving the unsworn formal statements presented by both sides, together with the presentence report and arguments of the respective counsel.

In this proceeding appellant did not present any request to the trial court for a formal hearing as required by I.C. § 19–2516 but participated without objection in the more informal type of hearing conducted by the sentencing judge. After the complained of statements were made by the prosecutor, appellant's counsel responded responded to these statements advising the court that the appellant would deny them, and continued by arguing that the court should consider appellant's age." (Emphasis in original) 609 P.2d at 645.

While the question there, the unsworn statements or argument of counsel, and that here, the use of preliminary hearing testimony, are not identical, we find the analogy persuasive. Where the defendant expressly or impliedly agrees to dispense with the formality possible under the statute, i. e., the presentation of all statements orally and under oath, and instead allows presentation of facts through prior evidence, presentence reports, argument of counsel, and the like, we find no prima facie error due to such use.

We recognize that cases where the death penalty may be imposed are not "under ordinary circumstances." Indeed, our strong belief is that the procedural requirements provided for by the legislature should be followed with care, especially since doing so assures this court of an opportunity to make a meaningful appellate review. Yet

---

4. While appellant's counsel did not object to the use of the preliminary hearing transcript, it is noted that he did indeed object to the sufficiency of the evidence disclosed therein. Thus, he relied upon the preliminary hearing record to show arguably mitigating circumstances and to facially show the absence of statutory aggravating factors beyond a reasonable doubt. Were we forced to evaluate the facts disclosed by the preliminary hearing record, we might agree with appellant that certain facts were not adequately proved to support the findings by the district court of aggravating factors "beyond a reasonable doubt." However, such an evaluation is unnecessary given the need for a new hearing on aggravating and mitigating circumstances and we express no opinion as to what the record shows or fails to show. *See* discussion *infra.* It can also be noted that any arguable problem with the sufficiency of the evidence adduced at the preliminary hearing does not extend to the use of that record at the sentencing stage, a use we here hold proper.

we here are faced with a situation where unreasoning adherence to the formal requirements would not materially add to the achievement of statutory objectives. We find no error in the court's consideration of the preliminary hearing record along with the other information before it.

■ B. Next, we consider appellant's argument that he was denied due process since the state did not formally notify him that it was seeking the death penalty or forewarn him as to which aggravating circumstances it would seek to prove beyond a reasonable doubt at the sentencing hearing. While "it is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause," *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, 402 (1977), the due process/notice requirements at sentencing are not necessarily the same as those at trial. *Williams v. New York*, 337 U.S. 241, 248–252, 69 S.Ct. 1079, 1084–1085, 93 L.Ed. 1337, 1343–1344 (1949), *reh. den.* 337 U.S. 961, 69 S.Ct. 1529, 93 L.Ed. 1760 (1949).

In the present case, under I.C. §§ 18–4004, 19–2513 and 19–2513A, upon pleading guilty to a charge of first degree murder appellant was informed that he could be sentenced to death, or to a determinate or indeterminate sentence of life imprisonment. Not only does the statute so notify, but the record reflects that the court below made the sentencing possibilities abundantly clear to appellant more than once during the proceedings. Indeed, the possibility of capital punishment was noted at each point in the proceedings where the plea of appellant was discussed. Whether the state would urge the maximum penalty or not was immaterial to the question of adequate notice to appellant that it was possible. We find no error in this regard.

In *Andrews v. Morris*, 607 P.2d 816 (Utah 1980) *cert. den.* 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980), the court dismissed the defendant's contention that the sentencing procedure was unconstitutional in that no notice was given as to the aggravating circumstances upon which the death penalty was sought. The Utah court held:

"It is to be noted that U.C.A., 1953, 76–5–202 specifically sets forth eight aggravating circumstances, one or more of which must be alleged, proved, and found by the fact finder. Hence, one charged with a capital felony is put on notice and is made aware of what the State must prove and thus able to prepare his defense." 607 P.2d at 822.

However, in *State v. Sonnier*, 379 So.2d 1336 (La.1979), the court stated:

"[A] defendant is entitled in a capital sentencing proceeding, no less than in the guilt or innocence trial, to be informed of the nature and cause of the accusation against him, LSA–Const. art. 1, § 13 (1974), and to his Fifth Amendment right to '[n]otice ... given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and "[setting] forth the alleged misconduct with particularly."' *In Re Gault*, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527, 459 [sic] (1967). Thus, the defendant is entitled to know the aggravating circumstances which the prosecution will seek to prove sufficiently in advance of court proceedings so that reasonable opportunity to prepare will be afforded." 379 So.2d at 1356.

However, the court in *Sonnier* then held that the defendant lacked standing to contest the issue because he had not alleged either that he was not so informed or that he had made any attempt to obtain the information.

We agree with the position taken by the Utah Supreme Court in *Andrews v. Morris, supra.* The statute clearly sets forth that one of the listed aggravating circumstances must be proven beyond a reasonable doubt, and must outweigh any mitigating circumstances shown, prior to imposition of death. Generally, it is apparent that there will be no surprise under the facts of any given case as to what potential aggravating circumstances are involved. Both defense counsel and prosecution who have participated in the earlier preliminary hearing and trial will ordinarily be well appraised and

conversant with the facts and issues involved in the aggravation-mitigation hearing. We additionally note that the statute, in I.C. § 19–2515(c), provides that should any party present evidence not previously disclosed, the court upon request shall adjourn the hearing until the opponent has had a reasonable opportunity to respond. Here, the district court expressly informed counsel to disclose the evidence and arguments to be relied upon at the hearing, and the state did so inform the appellant. Such protections are sufficient and we will not attach thereto a superfluous judicial requirement that the state formally notify a defendant of the particular aggravating circumstance upon which it will rely.

C. The next question before us is whether the trial court erred in failing to set forth the mitigating factors it considered. I.C. § 19–2515(d) states:

"(d) Upon the conclusion of the evidence and arguments in mitigation and aggravation the court shall make written findings setting forth any statutory aggravating circumstance found. Further, *the court shall set forth in writing any mitigating factors considered* and, if the court finds that mitigating circumstances outweigh the gravity of any aggravating circumstance found so as to make unjust the imposition of the death penalty, the court shall detail in writing its reasons for so finding." (Emphasis added)

As noted previously, the district court stated in its memorandum opinion that it had "searched all the information before it hoping sincerely to find circumstances in mitigation *which would overcome the circumstances of aggravation*—however, such mitigating circumstances do not exist." (Emphasis added.) The court also made the finding of fact:

5. While the ingestion of drugs or alcohol by appellant on the evening of the offense is not sufficient in itself to raise a defense to the crime, it is our conclusion that any arguable impact of such substance abuse is a proper consideration in mitigation of punishment upon sentencing. Such appears to be the effect of I.C. § 18–116. See also *State v. Gomez,* 94

"The Court further finds that there are no mitigating circumstances *which outweigh the gravity of aggravating circumstances* and which would make imposition of the death penalty unjust." (Emphasis added)

■ The record on appeal reflects that appellant's counsel raised below a number of arguable mitigating circumstances such as the nature of appellant's prior criminal record, his history of alcohol and polydrug abuse,[5] his personal and familial background, and the varying interpretations possible from the facts surrounding the offense. Not only were these issues raised and argued, they were also present in the presentence investigation and psychiatric reports and thus clearly before the district court.

I.C. § 19–2515(d) is mandatory in its terms: "the court *shall* set forth in writing any mitigating factors considered." The reasoning behind a similar statutory requirement for specific written findings was explained by the Florida Supreme Court:

"The fourth step required by Fla.Stat. § 921.141, F.S.A., is that the trial judge justifies his sentence of death in writing, to provide the opportunity for meaningful review by this Court. Discrimination or capriciousness cannot stand where reason is required, and this is an important element added for the protection of the convicted defendant. Not only is the sentence then open to judicial review and correction, but the trial judge is required to view the issue of life or death within the framework of rules provided by the statute." *State v. Dixon,* 283 So.2d 1, 8 (Fla.1973) *cert. den.* 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974).

■ We feel the requirement of written and detailed findings serves a dual purpose. Initially it focuses the attention of

Idaho 323, 325, 487 P.2d 686 (1971); *State v. Snowden,* 79 Idaho 266, 271, 313 P.2d 706 (1957). See generally, Liebman and Shepard, "Guiding Capital Sentencing Discretion Beyond the 'Boilerplate': Mental Disorder as a Mitigating Factor," 66 Georgetown Law Journal 757 (1978).

the sentencing court upon all the information before it and requires a thorough and reasoned analysis of all relevant factors. This helps assure that the imposition of the sentence of death is reasoned and objective as constitutionally required. It also serves the purpose, as noted by the Florida Supreme Court, of making the process for imposing death rationally reviewable. On review, if the mandates of I.C. § 19–2515(d) are met, we can determine whether the lower court overlooked or ignored any raised mitigating factors, whether the evidence supports the aggravating factors found, and finally whether the court has properly weighed all factors. If the findings of the lower court are not set forth with reasonable exactitude, this court would be forced to make its review on an inadequate record, and could not fulfill the function of "meaningful appellate review" demanded by the decisions of the United States Supreme Court. We hold that the legislative requirement that all mitigating factors considered be set forth must be met.[6]

In requiring the court to consider and specify mitigating factors, we pause to give some guidance on the matter. While the Idaho legislature has not provided any suggestions as to what constitute mitigating factors, statutes from other states do delineate possibilities.[7] The Model Penal Code sets forth the following factors among others:

"(a) The defendant has no significant history of prior criminal activity. (b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.... (g) At the time of the murder, the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or intoxication...." § 210.6(4) (Tent.Draft 1962).

See Fla.Stat.Ann. § 921.141(6); Neb.Rev. Stat. § 29–2523(2); Utah Code § 76–3–207. The Supreme Court noted in *Gregg v. Georgia, supra,* 428 U.S. at 197, 96 S.Ct. at 2936, 49 L.Ed.2d at 888 that the sentencing authority in that state is asked to determine whether there are any special facts about the defendant such as age, extent of cooperation with police, or emotional state at the time of the offense, which would mitigate against imposition of capital punishment. We generally note that the concept of mitigation is broad. Mitigating circumstances have been defined as:

"Such as do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability." Black's Law Dictionary (5th ed. 1979) at 903.

In previously discussing the court mitigating circumstances concept under our sentencing provisions, this court stated:

"It may be open to debate as to whether the 'circumstances' mentioned in § 19–2515, I.C., refer particularly to circumstances surrounding the commission of the crime and tending to aggravate or mitigate the character of the conduct involved, or whether such circumstances include also the convict, himself, as an individual, which would include his background, his age, upbringing and environment or any other matter appropriate to a determination of the degree of culpability. We think that the statute should be given the broader interpretation, particularly in a capital case." *State v. Owen,* 73 Idaho 394, 403, 253 P.2d 203, 207–208 (1953), *overruled on other grounds, State v. Shepherd,* 94 Idaho 227, 486 P.2d 82 (1971).

Such is still our feeling.

Thus, we conclude that there was error in the court's failure to specify in writing the

---

6. Though unavailable to the district court below at the time of original sentencing, I.C.R. 33.1 and 33.2 provide significant guidance in regard to such matters.

7. Of course, any such "suggestions," statutory or judicial, are not exclusive as the United States Supreme Court made clear in *Lockett v. Ohio, infra,* where a policy of unlimited mitigation was mandated.

mitigating factors it considered. Consequently, we remand for resentencing.

D. Appellant next argues that the statute is unconstitutional because it fails to specify mitigating factors. This argument was disposed of in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 2981, 57 L.Ed.2d 973 (1978), wherein the Supreme Court held it was unconstitutional for the legislature to limit the sentencing body's consideration of mitigating factors to those enumerated in a statute. *See also State v. Mata*, 125 Ariz. 233, 609 P.2d 48, 56–7 (1980) *cert. den.* 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980).

E. Appellant next assigns as error the court's finding "by a preponderance of the evidence" that he has exhibited a propensity to commit murder which would probably constitute a continuing threat to society.

The district court observed in response to this argument upon appellant's motion for correction or reduction of sentence:

"Sec. 19–2515 requires that aggravating circumstances must be found beyond a reasonable doubt and since the Court made such finding by preponderance rather than beyond a reasonable doubt, it is obvious that the Court did not consider such finding as an aggravating circumstance upon which it relied in making its ultimate sentencing. Perhaps such finding, since it was by a preponderance of the evidence rather than beyond a reasonable doubt, should not have been inserted as a finding. However, as above stated, the Court was cautious to note that the finding was made by a preponderance and was not considered by the Court as a statutory aggravating circumstance because it was not found beyond a reasonable doubt."

I.C. § 19–2515(f) states that at least one of the statutory aggravating circumstances must be found to exist beyond a reasonable doubt before the sentence of death may be imposed. A finding of an aggravating circumstance by preponderance of the evidence, we feel, should not enter into the statutorily required evaluative process in the absence of express legislative authorization. Yet the inclusion of such a finding here must be viewed in light of the court's statements that this finding was not relied upon as a statutory aggravating circumstance. While generally the inclusion of such a finding would be ill-advised due to its possible impact on the process of balancing the aggravating circumstances found beyond a reasonable doubt and the mitigating circumstances raised, here, due to the express exclusion of the finding by the sentencing court, we find no error.

F. Appellant next argues that due process is denied under the statutory scheme since the death penalty may be arrived at unless the court finds the mitigating circumstances outweigh the aggravating circumstance found. Appellant contends that this constitutes an impermissible shifting of the burden of proof to the defendant and cites the cases of *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *Woodson v. North Carolina, supra*, in support of this proposition. In *Mullaney*, the Supreme Court was faced with a state statutory scheme which placed the burden upon a defendant to prove by a preponderance of the evidence that he acted in the heat of passion in order to reduce a murder charge to manslaughter. The Supreme Court held this to be unconstitutional since the due process clause required the state to prove beyond a reasonable doubt the absence of heat of passion or sudden provocation when that issue was properly presented. 421 U.S. at 701–4, 95 S.Ct. at 1891–92, 44 L.Ed.2d at 520–22. What the court essentially decided was that the state had the burden of proving all elements of the offense, including establishing sufficient criminal intent when a legitimate issue on the question of intent was raised. The Court noted that in some situations the defendant bears the burden of production, i. e., of introducing some evidence to raise an issue, but the prosecution retains the burden of persuasion beyond a reasonable doubt. *Id.*

We find *Mullaney* unpersuasive authority for appellant's contention.[8] Here we are not concerned with proof of an element of the offense but rather are engaged in an inquiry into all relevant facts and circumstances which might weigh upon the propriety of capital punishment. The weighing process, in our opinion does not involve shifting the burden of persuasion but is concerned instead with the presentation of relevant information to the sentencer in order that a reasoned and considered decision can be reached. The defendant's burden is merely to raise, in the aggravation-mitigation hearing, any factors which might possibly tend to mitigate his culpability for the offense. He has full opportunity to present and argue those factors. The court below then evaluates those factors under the guidelines set forth in the statute. His decision, including his reasoning, is then set forth in detail and this court reviews the entire process. While it is possible to speak of a "burden" of persuasion on the defendant to establish why he should receive leniency, we feel that, under our sentencing process, the facts speak for themselves once presented. The completeness of the evaluative process below and the mandatory review by this court, we feel, withstands constitutional scrutiny. *Tichnell v. State*, 287 Md. 695, 415 A.2d 830, 848–50 (1980); *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253, 1258–9 (1978), *cert. den.* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979).

G. Appellant argues next that the language of the statutory circumstances found beyond a reasonable doubt by the district court[9] is unconstitutionally vague. We conclude that this statutory language withstands constitutional scrutiny.

The need for clear standards to guide the discretion of the sentencing body in death penalty cases was initially set forth in *Gregg v. Georgia, supra*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), wherein Justice Stewart noted that a death penalty scheme "could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with a result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." 428 U.S. 195, n. 46, 96 S.Ct. at 2935, 49 L.Ed.2d at 887. In *Gregg*, the petitioner argued that the language of the Georgia death penalty statute authorizing the imposition of death if the offense was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" was impermissibly vague and overbroad. The Supreme Court, however, held that this language was not unconstitutional on its face: "It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." 428 U.S. at 201, 96 S.Ct. at 2938, 49 L.Ed.2d at 890. Subsequently, in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Supreme Court held that where statutory provisions concerning aggravating circumstances such as these could be applied to any murder, a limiting construction is indispensable if the state is to meet its constitutional obligation "to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." 446 U.S. at 428, 100 S.Ct. at 1764, 64 L.Ed.2d at 406.

Under *Gregg*, it is apparent that the language contained in I.C. §§ 19–2515(f)(5) and (6) is facially constitutional. However, in-

---

**8.** The other case relied upon by appellant, *Woodson v. North Carolina, supra*, provides no support for the proposition advanced.

**9.** I.C. § 19–2515.

 " . . . .

 (f) The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed:

 (5) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

 (6) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life."

asmuch as a reasonable person could fairly characterize any murder as "especially heinous, atrocious or cruel, manifesting exceptional depravity" and as exhibiting an "utter disregard for human life," it is equally apparent under *Godfrey* that this court must place a limiting construction upon these statutory aggravating circumstances so as to avoid the possibility of their application in an unconstitutional manner.

Other jurisdictions have had an opportunity to construe statutory language similar to that contained in I.C. § 19–2515(f)(5). In *State v. Dixon*, 283 So.2d 1 (Fla.1973), *cert. den.*, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974), the defendant attacked the constitutionality of the statutory aggravating circumstance that "[t]he capital felony was especially heinous, atrocious or cruel." The Florida Supreme Court interpreted this language as follows:

> "[W]e feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. *What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.*" *Id.* at 9. (Emphasis added)

Subsequently, in *Profitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913, 925 (1976), the United States Supreme Court approved of this construction, observing that "[w]e cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." In *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881, 891 (1977) *cert. den.*, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158, *reh. den.*, 434 U.S. 961, 98 S.Ct. 496, 54 L.Ed.2d 322 (1977), the Nebraska Supreme Court considered the statutory aggravating circumstance that the murder "manifested exceptional depravity by ordinary standards of morality and intelligence," and stated:

> "In interpreting this portion of the statute, the key word is 'exceptional.' It might be argued that every murder involves depravity. The use of the word 'exceptional,' however, confines it only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence."

We agree with the definition of "heinous, atrocious and cruel" set forth by the Florida Supreme Court in *Dixon*, and with the definition of "exceptional depravity" set forth by the Nebraska Supreme Court in *Simants*. With these constructions, i. e., that the murder must be accompanied by acts setting it apart from the norm of murders and that its commission manifests such depravity as to offend all standards of morality and intelligence, the aggravating circumstance contained in I.C. § 19–2515(f)(5) is sufficiently definite and limited to guide the sentencing court's discretion in imposing the death penalty.

A similar limiting construction must be placed upon the aggravating circumstances in I.C. § 19–2515(f)(6), that "[b]y the murder, or the circumstances surrounding its commission, the defendant exhibited utter disregard for human life." To properly define this circumstance, it is important to note the other aggravating circumstances with which this provision overlaps. The second aggravating circumstance, I.C. § 19–2515(f)(2), that the defendant committed another murder at the time this murder was committed, obviously could show an utter disregard for human life, as could the third aggravating circumstance, I.C. § 19–2515(f)(3), that the defendant knowingly created a great risk of death to many persons. The same can be said for the fourth aggravating circumstance, I.C. § 19–2515(f)(4), that the murder was committed for remuneration. Since we will not

presume that the legislative intent was to duplicate any already enumerated circumstance, thus making I.C. § 19–2515(f)(6) mere surplusage (See, e. g., *Norton v. Dept. of Employment*, 94 Idaho 924, 500 P.2d 825 (1972)), we hold that the phrase "utter disregard" must be viewed in reference to acts other than those set forth in I.C. §§ 19–2515(f)(2), (3), and (4). We conclude instead that the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i. e., the cold-blooded, pitiless slayer. With such an interpretation, it is our conclusion that this aggravating circumstance meets the constitutional requirements set forth by the United States Supreme Court. Upon remand, the district court should, in accordance with his opinion and the provisions of I.C.R. 33.1 and 33.2 (enacted subsequent to original sentencing in this case), specifically set forth the facts and reasoning underlying the finding, if any, that a statutory aggravating circumstance exists.

 H. Finally, the appellant argues that the legislature improperly delegated the power to inflict the death penalty to the Board of Corrections. I.C. § 19–2716 provides:

"The punishment of death must be inflicted by the intravenous injection of a substance or substances in a lethal quantity sufficient to cause death until the defendant is dead. The director of the department of corrections shall determine the substance or substances to be used and the procedures to be used in any execution."

This argument was disposed of in *Ex parte Granviel*, 561 S.W.2d 503 (Tex.Cr.App.1978):

"[T]he existence of an area for exercise of discretion by an administrative officer under delegation of authority does not render delegation unlawful where standards formulated for guidance and limited discretion, though general, are capable of reasonable application . . . .

. . . .

It appears that the Legislature has declared a policy and fixed a primary standard and delegated to the said Director power to determine details so as to carry out the legislative purpose which the Legislature cannot practically or efficiently perform itself. The statute is sufficiently complete to accomplish the regulation of the particular matters falling within the Legislature's jurisdiction." 561 S.W.2d at 514–5.

We agree with this analysis; we will not assume that the director of the department of corrections will act in other than a reasonable manner.

### VI Conclusion

In light of the preceding discussion, the sentence of death is reversed. Additionally, being required under I. C. § 19–2827 to undertake an appellate review independent of any alleged errors raised on appeal, we note our awareness of that review, although it is clear the actual statutory review in regard to the present case awaits resentencing and the possibility that the penalty of death is again imposed.

Sentence reversed and case remanded for resentencing in accordance with this opinion.

BAKES, C. J., and DONALDSON, J., concur.

SHEPARD, J., dissents without opinion.

BISTLINE, Justice, separately concurring in reversal for resentencing.

Osborn pled guilty to a charge of first degree murder. He now appeals from the sentence of death which was imposed upon him. No trial having taken place, the following facts are taken from the transcript of the preliminary hearing.

### I.

Osborn and the murder victim, Charlotte Christine Carl, were both employed at a cafe in Pocatello. They were seen together in a room at the Holiday Inn on October 30, 1978. The next evening, the 31st, Osborn was stopped by a police officer for driving in an inattentive manner. Osborn was not

sufficiently intoxicated to be arrested, but the officer did ask Osborn's passenger, whom Osborn called Chris, to drive.

Later that night, Christine Carl's body, partially clothed, was found by the road. She had been shot three times in the head, once in the shoulder and once in the abdomen. Her face showed tremendous contusions on the right side, some bruising on the left side, and a fractured nose. The pathologist who performed the autopsy felt that the bullet wound behind the ear was a close contact wound, while those wounds in the temple were probably fired at a distance, although he conceded that such could have been incurred at a distance of less than eighteen inches. The pathologist stated that the amount of blood indicated her nose had been broken prior to her being shot. He also stated that in this opinion the beating occurred prior to the shooting, but he then stated that this was merely conjecture as the same bruising would have occurred had the beating occurred immediately as she was shot to death.

About 10:30 that night Osborn arrived at Lucy Baker's home, driving Christine Carl's car. He had a pistol in his possession and blood on his vest, chest and boots. Osborn, who appeared to be acting "weird," but who did not appear to be drunk, stated that he had shot Christine Carl. He first stated he had buried her body in the mountains; then he said he had put it on some railroad tracks. He also stated that she had called the cops on him and that was why he had had to shoot her.

Two occupants of Baker's house, at Osborn's request, hid the car. They observed blood on the front seat and passenger door.

The police later searched the Baker premises and found a .22 cal. nine-shot revolver. This revolver was at the FBI lab in Washington at the time of the preliminary hearing, so only pictures of it were introduced in evidence. The FBI report stated that the gun could have been the murder weapon, and that the cylinder of the gun had to be manually rotated before each round could be fired.

Martin Sullinger testified that in October 1978 he had sold Osborn a revolver of the type discovered. He agreed with the FBI report as to the weapon's mechanical attributes.

After being bound over to district court, and after the filing of an information charging him with murder in the first degree, Osborn notified the court of an intent to rely on a defense of mental disease or defect under the provisions of I.C. § 18–209. The psychiatrist found that he was not within the protection of I.C. § 18–211, and indicated that Osborn claimed a history of polydrug abuse, and that Osborn claimed to have been on drugs at the time of the crime. As to Osborn's claim that he remembered nothing of the crime, the psychiatrist stated his opinion that such claim of amnesia was not genuine.

Osborn subsequently pled guilty. The district court, following a hearing, the sufficiency of which is not challenged, accepted the plea. After submission of a presentence report, an aggravation/mitigation hearing was held. At that hearing, neither side called witnesses. The prosecutor advised the court that "because I think we do have a—a good record of what transpired in the preliminary hearing, instead of calling witnesses today, [I choose] to rely on the testimony presented at the preliminary hearing . . . ." The trial court therefore had for sentencing purposes the oral arguments of counsel, an oral statement by Osborn, the presentence report, the transcript and exhibits from the preliminary hearing, the FBI report and the § 18–211 psychiatric evaluation.

The court found the following two aggravating circumstances beyond a reasonable doubt: (1) that "the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity"; and (2) "that by the murder and the circumstances surrounding its commission, the defendant exhibited utter disregard for human life." The court also found, but only by a preponderance of the evidence, the aggravating circumstance that Osborn, by prior conduct and by his conduct in the murder, "has exhibited a

propensity to commit murder and will probably constitute a continuing threat to society."

As to mitigating circumstances, the court succinctly found only that there were none which outweighed the gravity of the aggravating circumstances. Pursuant to I.C. § 19–2515, the court imposed the death penalty. We * now have the case before us both as an ordinary appeal, and also on mandatory review of the death sentence as required under I.C. § 19–2827.[1]

II.

Prior to 1977, I.C. § 18–4004 made the death penalty mandatory for those defendants convicted of first degree murder. However, in light of the opinion of the United States Supreme Court in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), which held a mandatory death penalty statute virtually identical to Idaho's unconstitutional, the legislature amended I.C. §§ 18–4004 and 19–2515, obviously done in an apparent attempt to meet the objections of the Supreme Court. The basic premise of *Woodson* and its companion cases, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), is that the sentencing body must be given "specific and detailed guidance to assist them in deciding whether to impose a death penalty" in order "to assure that the death penalty will not be imposed in an arbitrary or capricious manner." 428 U.S. at 252–53, 96 S.Ct. at 2967. To meet this mandate the legislature, in enacting § 19–2515, provided for a sentencing hearing at which all relevant information could be presented to the trial court, listed the aggravating circumstances that must be found in order to impose a sentence of death, provided that at least one aggravating circumstance must be found beyond a reasonable doubt, and provided that the defendant shall be sentenced to death un-

* As is evident, the usage of the word "we" throughout this opinion is a matter of literary license. The reason for so doing will be explained by the addendum to this opinion.

1. I.C. § 19–2827 provides as follows:

"(a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Idaho. The clerk of the trial court, within ten (10) days after receiving the transcript, shall transmit the entire record and transcript to the Supreme Court of Idaho and to the attorney general together with a notice prepared by the clerk and a report prepared by the trial judge setting forth the findings required by section 19–2515(d), Idaho Code, and such other matters concerning the sentence imposed as may be required by the Supreme Court. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a narrative statement of the judgment, the offense, and punishment prescribed. The report may be in the form of a standard questionnaire prepared and supplied by the Supreme Court of Idaho.

"(b) The Supreme Court of Idaho shall consider the punishment as well as any errors enumerated by way of appeal.

"(c) With regard to the sentence the court shall determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

"(2) Whether the evidence supports the judge's finding of a statutory aggravating circumstance from among those enumerated in section 19–2515, Idaho Code, and

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

"(d) Both the defendant and the state shall have the right to submit briefs within the time provided by the court, and to present oral argument to the court.

"(e) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

"(1) Affirm the sentence of death; or

"(2) Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel.

"(f) The sentence review shall be in addition to direct appeal, if taken, and the review and appeal shall be consolidated for consideration.

"(g) The Supreme Court shall collect and preserve the records of all cases in which the penalty of death was imposed from and including the year 1975."

less the mitigating circumstances outweigh the gravity of the aggravating circumstances. Further, in I.C. § 19–2827 the legislature provided for mandatory Supreme Court review of all death sentences. Osborn on his appeal raises numerous challenges both to the sentencing procedure followed below and to the constitutionality of § 19–2515.

## III.

A. The first issue raised by Osborn is his contention that the trial court erred in relying on the preliminary hearing transcript at the sentencing hearing, as opposed to requiring the state to present the testimony of witnesses in open court. Since Osborn did not object to the use of the preliminary hearing transcript, and in fact acquiesced in its use, we must initially determine whether the general rule which precludes our review of matters not objected to, *State v. Garcia*, 100 Idaho 108, 594 P.2d 146 (1979), *State v. Watson*, 99 Idaho 694, 701, 587 P.2d 835, 842 (1978), precludes our consideration of this issue. The general rule applicable to appeals is not necessarily controlling where we are mandated to conduct a review, irrespective of the defendant's contentions, if any, the simple reason being that the legislature in providing for mandatory review was surely aware of that which Justice Powell wrote:

> "[F]ive members of the Court have now expressly recognized that death is a different kind of punishment from any other which may be imposed in this country. . . . From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1976).

I.C. § 19–2827 mandates not only that we examine the sentence imposed, but the procedure followed in imposing that sentence, regardless of whether an appeal is even taken. The gravity of a sentence of death, and the infrequency with which it is imposed, outweigh any administrative convenience that might be achieved by refusing to consider unchallenged errors.

Other jurisdictions similarly do not allow technical appellate rules to preclude a comprehensive review of those cases where a sentence of death has been imposed. In *Com. v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978), for instance, the defendant, who had been sentenced to death, on appeal alleged various errors at his trial but did not challenge his sentence or the constitutionality of the statute under which he was sentenced. Nonetheless, the court, after noting the rule that failure to object to a sentence at sentencing forecloses appellate review of that sentence, refused to apply that rule:

> "We recognize, of course, that the doctrine of waiver is, in our adversary system of litigation, indispensable to the orderly functioning of the judicial process. There are, however, occasional rare situations where an appellate court must consider the interests of society as a whole in seeing to it that justice is done, regardless of what might otherwise be the normal procedure. One such situation is surely the imposition of capital punishment. That this is a unique penalty requiring special jurisprudential treatment is a concept now embodied in a statutory law of this Commonwealth. Thus section 1311(g) of the Crimes Code expressly provides that '[a] sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania . . . .' See also Rule 1941 of the Pennsylvania Rules of Appellate Procedure. This is illustrative of a general proposition that while a defendant may normally make an informed and voluntary waiver of rights personal to himself, his freedom to do so must give way where a substantial public policy is involved; in such a case an appeals court may feel fully warranted in

seeking to reach an issue. We have no doubt that this is such a case. Because imposition of the death penalty is irrevocable in its finality, it is imperative that the standards by which that sentence is fixed be constitutionally beyond reproach." *Id.* 383 A.2d at 180–81 (footnotes omitted).

Similarly, in *State v. Brown*, 607 P.2d 261 (Utah 1980), there was no objection to the trial court's failure to include in its voir dire of the jury panel a question on their beliefs on the death penalty, nor was there a request for such inquiry. The court stated that "[n]evertheless, as this is a capital case, we considered the defendant's contention on appeal." *Id.* at 265. And in *State v. Ceja*, 115 Ariz. 413, 565 P.2d 1274 (1977), *cert. den.* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977), the court independently reviewed the record to insure that defendant was accorded a fair trial, in spite of the fact that the defendant did not allege any error in the trial. *See also State v. Martin*, 243 Iowa 1323, 55 N.W.2d 258 (1952) ("[n]o human life should be taken by judicial order until every requirement of statutory law and justice has been complied with"); *Tuggle v. State*, 73 Okl.Cr. 208, 119 P.2d 857, 859 (1941) (in a capital case "it is the practice of this court to thoroughly examine the record, and consider any errors that may be presented, which are fatal to the accused's rights, even though such errors were not challenged and preserved by objections, exceptions or assignments of error"); *State v. Taylor*, 213 S.C. 330, 49 S.E.2d 289, 289 (1948) *overruled on other grounds* in *State v. Jones*, 268 S.C. 227, 233 S.E.2d 287, 289 (1977) ("it is well settled that where the death penalty is involved, it is the duty of this Court to examine the record for any errors affecting the substantial rights of the accused, even though not made a ground of appeal."); *State v. St. Clair*, 3 Utah 2d 230, 282 P.2d 323, 327 (1955) ("[w]hile we will not ordinarily raise questions of error on our own motion . . . in capital cases when the interests of justice so require the entire proceeding should be reviewed to determine whether errors occurred as a consequence of which the accused did not have a fair trial, even though not assigned and argued."); *State v. Russell*, 106 Utah 116, 145 P.2d 1003, 1007 (1944) ("[t]his being a capital case, it is the duty of this court to consider manifest and prejudicial error even though not assigned nor argued."); *State v. Stenback*, 78 Utah 350, 2 P.2d 1050, 1056 (1931) ("[t]his ruling of the trial court is not assigned as error and is not argued, yet this court, in a capital case such as this, may and should sua sponte consider manifest and prejudicial errors which are neither assigned nor argued"). *See generally State v. White*, 97 Idaho 708, 551 P.2d 1344 (1976) *cert. den.* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976) (court will review fundamental error even if no objection is made at trial); *State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971) (court may consider error even though not objected to).

We hold that the trial court erred in allowing the use of the preliminary hearing transcript. True, I.C. § 19–2515(c)[2] does provide that "[e]vidence admitted at trial shall be considered and need not be repeated at the sentencing hearing," but no such provision applies to evidence received at a preliminary hearing. Not only do we perceive a vast difference where the sen-

---

**2.** I.C. § 19–2515(c) provides as follows:

"(c) In all cases in which the death penalty may be imposed, the court shall, after conviction, order a presentence investigation to be conducted according to such procedures as are prescribed by law and shall thereafter convene a sentencing hearing for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense. At such hearing, the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation. Should any party present aggravating or mitigating evidence which has not previously been disclosed to the opposing party or parties, the court shall, upon request, adjourn the hearing until the party desiring to do so has had a reasonable opportunity to respond to such evidence. Evidence admitted at trial shall be considered and need not be repeated at the sentencing hearing. Evidence offered at trial but not admitted may be repeated or amplified if necessary to complete the record."

tencing court reads a cold record instead of hearing and seeing live witnesses, but we also must have due regard for I.C. § 19–2516:

"The circumstances must be presented by the testimony of witnesses examined in open court, except that when a witness is so sick or infirm as to be unable to attend, his deposition may be taken by a magistrate of the county, out of court, upon such notice to the adverse party as the court may direct. *No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section.*" (Emphasis added.)

In *State v. Coutts*, 101 Idaho 110, 609 P.2d 642 (1980), this Court held that the district court did not have to follow the formal requirements of § 19–2516 *in the absence of an explicit request therefor.* This decision was said to be based on the belief that any other requirement would impose a useless formality on the trial courts by requiring the swearing of witnesses for even the most perfunctory of facts and on the belief that the provisions for presentence reports had relaxed the requirements of § 19–2516. The Court proceeded to hold that "[i]n order to maintain a viable system of sentencing hearings, under *ordinary circumstances*, such hearings normally need not be encumbered with all the procedural requirements which attend a resolution of the issue of guilt or innocence." 101 Idaho at 113, 609 P.2d at 645 (emphasis added). We hold today that those cases in which the death penalty may be imposed do not represent "ordinary circumstances." The gravity and infrequency of a sentence of death are such that it is necessary that all procedural formalities be followed with the utmost care. Such a proposition need not be belabored.

Our conclusion is buttressed by our decisions with regard to the use of preliminary hearing testimony at trial. In that regard, we have noted that the only function of a

preliminary hearing is to determine whether a crime has been committed and whether there is probable cause to believe that the crime was committed by the accused. *State v. Ruddell*, 97 Idaho 436, 546 P.2d 391 (1976); *State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971). At a preliminary hearing neither the prosecutor nor the defense counsel has any incentive to go to great lengths in presenting his case, or in cross-examining the other side's witnesses. The preliminary hearing is usually held at an early stage in the proceedings so that the defense counsel has had little time to prepare, or having prepared, sees no reason to display, his hand—or, in some situations may well realize that the examining magistrate is not inclined to hear any testimony which merely raises questions of fact. A magistrate does not pass upon guilt, and there seems to be some view in the state that issues of fact ought not be passed upon either. In fact, in *Freeman v. State*, 87 Idaho 170, 392 P.2d 542 (1964), the Court put the matter wholly at rest:

" 'A *preliminary examination before a committing magistrate is in no sense a trial.* The purpose is to obtain the judgment of a magistrate to the effect that a crime has or has not been committed, and if committed that there is reasonable ground to believe that the person accused is guilty of committing the crime. It is not to be expected, nor is it required, that the same formality and precision must obtain in a preliminary examination as is required upon the trial.' *State v. Bilboa*, 33 Idaho 128, 190 P. 248." 87 Idaho at 177, 392 P.2d at 546 (emphasis added).

Later in the opinion the Court quoted the Supreme Court of Minnesota for an almost identical statement as to a preliminary hearing being in no sense a trial, also describing it as being merely a process whereunder the state may determine if it wants to proceed further against the accused. 87 Idaho at 179, 392 P.2d at 547.

The same reasoning applies to the case at bar. Before a sentence of death can be imposed, I.C. § 19–2515(f) requires that at least one aggravating circumstance must be proven beyond a reasonable doubt. A pre-

liminary hearing is simply not designed nor intended to produce evidence establishing facts beyond a reasonable doubt; a defendant who pleads guilty, and hence has no trial, is entitled to a procedure as searching and reliable as a trial before it is determined that he should be put to death.

B. Next we will consider Osborn's argument that he was denied due process in that the state did not formally notify him that it was seeking the death penalty or forewarn which specific aggravating circumstances it would at the sentencing hearing seek to prove beyond a reasonable doubt. While "it is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause," *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977), the due process requirements at trial are not necessarily the same as those at sentencing. *Williams v. People,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

In *Andrews v. Morris,* 607 P.2d 816 (Utah 1980) *cert. den.* 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980), the court dismissed the defendant's contention that the sentencing procedure was unconstitutional in that no notice was given as to the aggravating circumstances upon which the death penalty was sought as follows:

"It is to be noted that U.C.A., 1953, 76–5–202 specifically sets forth eight aggravating circumstances, one or more of which must be alleged, proved, and found by the fact finder. Hence, one charged with a capital felony is put on notice and is made aware of what the State must prove and thus able to prepare his defense." *Id.* at 822.

However, in *State v. Sonnier,* 379 So.2d 1336, 1356 (La.1979), the court stated the following:

"Unquestionably, the need for reliability in the determination of whether to impose the death penalty by adversary proceedings demands that an accused be afforded full rights of due process. Accordingly, a defendant is entitled in a capital sentencing proceeding, no less than in the guilt or innocence trial, to be informed of the nature and cause of the accusation against him, LSA–Const. Art. 1, § 13 (1974) and to his Fifth Amendment right to '[n]otice ... given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and "[setting] forth the alleged misconduct with particularity." ' *In re Gault,* 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527, 459 [sic] (1967). Thus, the defendant is entitled to know the aggravating circumstances which the prosecution will seek to prove sufficiently in advance of court proceedings so that reasonable opportunity to prepare will be afforded."

However, the court then held the defendant lacked standing to contest the issue because he had not alleged either that he was not so informed or that he had made any attempt to obtain that information.

In the present case, under § 18–4004, upon pleading guilty to a charge of first degree murder Osborn was informed that he could be sentenced to death, or to a determinate or indeterminate life term.

As to whether the state must give notice of which aggravating circumstances it will seek to prove beyond a reasonable doubt, we agree with the reasoning set forth in *State v. Sonnier, supra,* insofar as it states that the defendant must be notified of which aggravating circumstances the state will seek to establish beyond a reasonable doubt. The execution of a sentence imposing death is a final, non-correctable event. A defendant should not be put to the burden of preparing to disprove all ten aggravating circumstances, and the burden placed on the state by requiring notification is minimal at most.

However, in the present case, at the aggravation/mitigation hearing Osborn's attorney stated that he had discussed with the prosecutor the subjects that he would "raise in aggravation with respect to the imposition of sentence . . . ." The latter procedure would be to set them out in writing so that they are available for review, *see, e. g.,* Md.Code, Ann. Art. 27 § 412, and since this will pose no hardship on the state, we hold

that the state must provide the defendant in a capital case with a list of the aggravating circumstances which it will seek to prove. Since we must remand this case for resentencing, the state can supply Osborn with such notice prior to any future sentencing hearing.

C. The next question before us is whether the trial court erred in failing to set forth the mitigating factors it considered. I.C. § 19–2515(d) is as follows:

"Upon the conclusion of the evidence and arguments in mitigation and aggravation the court shall make written findings setting forth any statutory aggravating circumstance found. Further, *the court shall set forth in writing any mitigating factors considered* and, if the court finds that mitigating circumstances outweigh the gravity of any aggravating circumstance found so as to make unjust the imposition of the death penalty, the court shall detail in writing its reasons for so finding." (Emphasis added.)

In its memorandum opinion, the trial court stated the following:

"This court, because of the extreme burden imposed upon the sentencing judge by the statute and the offense itself, has consciously searched all the information before it hoping sincerely to find circumstances in mitigation *which would overcome the circumstance of aggravation* —however, such mitigating circumstances do not exist." (Emphasis added.)

The court then made the following finding of fact:

"The Court further finds that there are no mitigating circumstances. *which outweigh the gravity of aggravating circumstances* and which would make imposition of the death penalty unjust." (Emphasis added.)

The State now maintains the only way to interpret this finding is that the trial court concluded there were no mitigating circumstances. We cannot agree. These statements by the trial court indicate that the court examined the written transcript for mitigating circumstances which might *outweigh* the gravity of aggravating circumstances, but found none. Moreover, the finding of fact quoted can be read as implying that there were some mitigating circumstances, but that they simply did not outweigh the aggravating circumstances. *See State v. Mata*, 125 Ariz. 233, 609 P.2d 48, 57 (1980) *cert. den.* 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980) (where the trial court apparently made the specific finding that mitigating circumstances were absent).

I.C. § 19–2515(d) is mandatory in its terms; the trial court *must* set forth in writing any mitigating factors considered. The reasoning behind a Florida statutory provision that the trial judge must justify his sentence of death in writing was explained in *State v. Dixon*, 283 So.2d 1, 8 (Fla.1973) *cert. den.* 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974), as follows:

"The fourth step required by Fla.Stat. § 921.141, F.S.A., is that the trial judge justifies his sentence of death in writing, to provide the opportunity for meaningful review by this Court. Discrimination or capriciousness cannot stand where reason is required, and this is an important element added for the protection of the convicted defendant. Not only is the sentence then open to judicial review and correction, but the trial judge is required to view the issue of life or death within the framework of rules provided by the statute."

As added by the court in *Dixon* :

"It must be emphasized that the procedure to be followed by the trial judges ... is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present. Review by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar cir-

cumstances in another case." 382 So.2d at 10.[3]

The requirement that the mitigating factors considered be set forth is not merely a procedural formality imposed by the legislature as a burden on trial courts. Rather, we see compliance therewith as being necessary to insure that this Court can make the proper and thorough review of any sentence of death which the legislature in turn requires of us. The statutory procedure provides that in the first instance the trial court must set down all the mitigating factors it considers and the aggravating circumstances it finds. If the mitigating factors outweigh the aggravating circumstances, the court is to detail its reasons for so finding. By requiring these findings, the legislature has provided a procedure where on review we can fulfill our obligation to determine first whether the trial court ignored or overlooked any mitigating factors, secondly, whether the evidence supports the aggravating factors found, and finally whether the court has properly weighed these factors. Where the trial court does not set forth the mitigating factors it has considered, it is impossible for us to pass on the propriety of the basic weighing process undertaken by the court. The trial court, having heard the witnesses, is in a far better position to pass a first judgment on mitigating and aggravating circumstances than is this Court. But if the reasoning of the trial court is not set forth with reasonable exactitude, this Court would be forced to make its review on an inadequate record. We hold that the legislative mandate found in I.C. § 19–2515(d), that all mitigating factors considered must be set forth, must be met.

So viewed, we need not speculate whether the trial court finding in question might have been intended to be understood as a conclusion that there were no mitigating factors. In this regard we note that although the Idaho legislature has not delineated that which constitutes a mitigating

factor, statutes from other states do suggest certain factors. For instance, Model Penal Code § 210.6(4) (Proposed Official Draft 1962), which appears to have been influential in other states, suggests the following factors, among others:

"(a) The defendant has no significant history of prior criminal activity. (b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance . . . . (g) At the time of the murder, the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication."

See Fla.Stat.Ann. § 921.141(5); Neb.Rev. Stat. § 29–2523; Utah Code § 76–3–207. Moreover, the United States Supreme Court, in discussing the need to focus the sentencing authority's attention on the specific circumstances of the crime, noted, while upholding the Georgia death penalty statute, that the jury (the sentencing authority in Georgia) is asked whether "there are any special facts about this defendant that mitigate against imposing capital punishment (e. g., his youth, the extent of his cooperation with the police, his emotional state at the time of the crime.)" *Gregg v. Georgia*, 428 U.S. 153, 197, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976).

D. Defendant also argues that the statute is unconstitutional because it fails to specify mitigating factors. This argument was disposed of in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), wherein the United States Supreme Court held it was unconstitutional for the legislature to limit the sentencing body's consideration of mitigating factors to those enumerated in a statute. See *State v. Mata*, 125 Ariz. 233, 609 P.2d 48, 56–57 (1980) (holding that a policy of unlimited mitigation is expressly mandated by the United States Supreme Court).

---

**3.** This is consistent with I.C. § 19–2827, which mandates a review by this Court of all cases

where the death penalty is imposed.

E. We next consider whether the trial court erred in making the finding, by a preponderance of the evidence, that Osborn "by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society." The state argues that this finding is irrelevant because there were two other aggravating circumstances found beyond a reasonable doubt. While it is true there is no indication that the trial court relied on this finding in imposing the sentence of death, the requirement that aggravating and mitigating factors be balanced against each other is so important that any error that might affect that balance cannot be tolerated. Since we reverse on other grounds, we need not decide whether the evidence supports that finding; or that it should have been made at all. But for future guidance, we pause to consider the proposition.

In *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881, 888 (1977) *cert. den.* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977), the court stated:

"Section 29–2522, R.R.S. 1943, now requires a determination after hearing that sufficient aggravating circumstances exist to justify. the imposition of a death penalty. As the United States Supreme Court noted in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976): 'death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.'

"We believe the obvious intent of the statute is that the enumerated aggravating circumstances should require strong proof. Aggravating circumstances are now a mandatory element to be considered in capital cases. The sentence depends upon the proof of some aggravating circumstance. We believe it is the intent of the act to require the facts upon which the aggravating circumstances . . .

are based be proved beyond a reasonable doubt, and so construe it."

Similarly, in *State v. Dixon, supra,* the court held that "[t]he aggravating circumstances . . . actually defined those crimes . . . to which the death penalty is applicable in the absence of mitigating circumstances. As such, they must be proved beyond a reasonable doubt before being considered by judge or jury." 283 So.2d at 9.

I.C. § 19–2515(f) states that "[a]t least one [aggravating circumstance] . . . must be found to exist beyond a reasonable doubt before a sentence of death can be imposed." This language is capable of being understood to imply that other aggravating circumstances can be found to exist by a standard less than "beyond a reasonable doubt," that only one aggravating circumstance need be found "beyond a reasonable doubt." This would mean that other aggravating circumstances could be found by a preponderance of the evidence, and that they could be used in the balancing test against any mitigating factors considered.

We do not believe that this is what the legislature intended. Section 19–2515(b) states that the court shall sentence the defendant to death where it finds *a* statutory aggravating circumstance, unless mitigating circumstances outweigh the gravity of any aggravating circumstance found. Similarly, § 19–2515(d) states that "if the court finds that mitigating circumstances outweigh the gravity of any aggravating circumstance found so as to make unjust imposition of the death penalty, the court shall detail in writing its reasons for so finding." In neither of these sections does the legislature mention the standard of proof for finding an aggravating circumstance. Due to the gravity of the death penalty, we believe the legislature intended to apply the same standard of proof for aggravating circumstances as for the elements of a crime, *i. e.,* beyond a reasonable doubt. The language that at least one such circumstance must be found to exist beyond a reasonable doubt before a sentence of death can be imposed means only that if not even a single such circumstance is found, a

sentence of death cannot be imposed. It does not mean that where one such circumstance is found beyond a reasonable doubt, it follows that other circumstances may permissibly be found by a preponderance. Any other interpretation could conceivably allow aggravating circumstances to outweigh mitigating circumstances in cases where only one aggravating circumstance was found beyond a reasonable doubt, but many were found by a preponderance. A factual finding arrived at by a preponderance of the evidence is insufficient to be entered into the balancing process in the absence of an explicit legislative directive to that effect.

F. Next, Osborn argues that due process is denied in the statutory scheme where the death penalty may be arrived at on the finding of a statutory aggravating circumstance unless the court finds that mitigating circumstances outweigh aggravating circumstances, in that the burden of proof is improperly placed on the defendant. To support his argument Osborn cites *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). However, *Mullaney* dealt only with proving the elements of a crime, while *Woodson* held only that it was unconstitutional to impose a mandatory death penalty.

The court in *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253, 1259 (1978) *cert. den.* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979), stated the following:

"When the issue of guilt is settled and only the question of punishment remains, due process is not offended by requiring the already guilty defendant to carry the burden of showing why he should receive leniency. This is not contrary to the due process requirement that the State has the burden of proof as to guilt of the defendant. In discussing affirmative defenses when sanity was a question, the United States Supreme Court stated:

'Among other things, it is "normally within the power of the 'State to regulate procedures under which its laws

are carried out, including the burden of producing evidence and the burden of persuasion,' and its decision in this regard is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so deeply rooted in the traditions and conscience of our people as to be ranked as fundamental.' (citations omitted)" *Patterson v. New York*, 432 U.S. 197, 201–02, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281, 286–87 (1977).' "

In that case, the court then held that the state did not have to negate every mitigating circumstance.

Under the Maryland capital punishment statute, where the sentencing authority finds beyond a reasonable doubt the existence of one or more aggravating factors, then it must determine whether, by a preponderance of the evidence, any one of the mitigating factors exist. If, by a preponderance of the evidence, the sentencing body finds that the mitigating circumstances outweigh the aggravating circumstances, then a sentence of life imprisonment is imposed. If the mitigating circumstances do not outweigh the aggravating circumstances by a preponderance of the evidence, however, then a sentence of death must be imposed. Md.Code Ann.Art. 27 § 413(h). The court upheld the constitutionality of these provisions in *Tichnell v. State*, 287 Md. 695, 415 A.2d 830, 848 (1980), as follows:

"That it is not a mandatory death penalty statute is clear. Because it allows for a broad consideration of mitigating circumstances, it plainly withstands scrutiny under *Woodson v. North Carolina, supra* [428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, 19 Cr.L. 3287 (1976)], and *Roberts v. Louisiana, supra* [431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 627, 21 Cr.L. 3076 (1976)]. Furthermore, it is clear that the statute complies with the three general methods of guiding the discretion vested in the sentencing authority under *Gregg, Proffitt,* and *Jurek.* The statute provides a bifurcated trial procedure, and the imposition of the death penalty is limited to

cases in which the sentencing authority finds at least one aggravating circumstance. The sentencing authority is required to consider the existence of mitigating circumstances. A sentence of death may be imposed only if the mitigating circumstances do not outweigh the the aggravating circumstances. Although the sentencing authority still has discretion under the statute, it is guided by clear and objective standards."

Under the Idaho statutory scheme, the trial court's discretion is properly guided. There is nothing which is made mandatory without resort to the statutory provisions; the defendant has a full opportunity to present mitigating factors. As such, it withstands constitutional scrutiny.

G. Next, Osborn argues that the aggravating circumstances found beyond a reasonable doubt by the trial court, I.C. §§ 19–2515(f)(5) & (6), are unconstitutionally vague. The need for clear standards for the sentencing body to follow was set forth in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980), as follows:

"[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.' *Gregg v. Georgia*, supra, 428 U.S., at 196, n.47, 96 S.Ct., at 2936, n.47. *See also Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' As was made clear in *Gregg*, a death penalty 'system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result

that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur.' 428 U.S., at 195, n.46 [96 S.Ct., at 2935 n.46]." (Footnotes omitted.)

In the case before us the district court, using only the statutory language, wrote that "the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity," and that "by the murder and the circumstances surrounding its commission, the defendant exhibited utter disregard for human life." The district court apparently did not feel compelled to explain the reasoning behind these findings beyond his narration of the facts. Nothing in the statute seemed to require more. We hold, however, that these phrases, without a limiting definition, are unconstitutional. Because we remand for resentencing, we do not need to ponder upon the effect of the trial court's failure to place any limiting definition on these phrases.

We will deal first with the constitutionality of I.C. § 19–2515(f)(5), which sets forth the aggravating circumstance that "the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity." In *Godfrey v. Georgia, supra,* the United States Supreme Court reversed a sentence of death based solely upon the finding that the offense was "outrageously or wantonly vile, horrible and inhuman." Georgia Code Ann. § 27–2534.1(b)(7) provides that a person convicted of murder may be sentenced to death if it is found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." This aggravating circumstance had been upheld as not unconstitutional on its face in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), wherein the Court noted that although it is arguable that any murder involves depravity of mind or an aggravated battery, "there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." 428 U.S. at 201, 96 S.Ct. at 2938. Subsequently, the Georgia Supreme Court adopt-

ed a limiting construction that the offense had to demonstrate "torture, depravity of mind, or an aggravated battery to the victim." 100 S.Ct. at 1766.

The evidence in *Godfrey*, however, showed that the defendant did not torture or commit an aggravated battery upon his victims. The Supreme Court therefore held that the validity of the death sentence turned on whether the Georgia Supreme Court had supplied a constitutional construction to the phrase "outrageously or wantonly vile, horrible or inhuman in that [they] involved . . . depravity of mind . . . ." *Id.* at 1767. The court found that defendant's "crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder." *Id.* Since there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not," *id.*, the court reversed the judgment upholding the sentence of death.

Under the decision in *Godfrey*, the simple phrase "the murder was especially heinous, atrocious or cruel" must be limited so as to be constitutional, and the addition of the phrase "manifesting exceptional depravity" in I.C. § 19–2515(f)(5) does not alter that result, for "exceptional depravity" can apply to any murder in the same manner as "especially heinous, atrocious or cruel."

In *State v. Dixon*, 283 So.2d 1 (Fla.1973) *cert. den.* 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974), the defendant attacked the constitutionality of the aggravating circumstance—"[t]he capital felony was especially heinous, atrocious or cruel." The Florida court interpreted these terms as follows:

"[W]e feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the consciousless or pitiless crime which is unnecessarily tortuous to the victim." 283 So.2d at 9.

The United States Supreme Court upheld this provision, holding that "[w]e cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." *Proffitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976). *See also State v. Watson, supra*, 586 P.2d at 1259; *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977) *cert. den.* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978); *State v. Sonnier*, 379 So.2d 1336 (La.1979).

In *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881, 891 (Neb.1977) *cert. den.* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977), the court noted that the Nebraska statutory language also includes ". . . or manifested exceptional depravity by ordinary standards of morality and intelligence." The Nebraska court then interpreted that language as follows:

"In interpreting this portion of the statute, the key word is 'exceptional.' It might be argued that every murder involves depravity. The use of the word 'exceptional', however, confines it only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence."

In *Blake v. State*, 239 Ga. 292, 236 S.E.2d 637 (1977) *cert. den.* 434 U.S. 960, 98 S.Ct. 492, 54 L.Ed.2d 320 (1977), the court stated that "the depravity of the mind contemplated by the statute is that which results in torture or aggravated battery to the victim." 236 S.E.2d at 643.

The legislature in enacting § 19–2515 intended to comply with the requirements set forth by the Supreme Court, and therefore intended to limit the death penalty to the

most aggravated of cases. While the "especially heinous, atrocious or cruel language" refers to the amount of pain suffered by the victim, the exceptional depravity language refers to the state of mind of the defendant. *See Harris v. State*, 237 Ga. 718, 230 S.E.2d 1 (1976) *cert. den.* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 251 (1977). We agree with the definition of heinous, atrocious and cruel set forth by the Florida court in *Dixon*, and with the definition of exceptional depravity set forth by the Nebraska court in *Simants.* With this construction, that the crime must be accompanied by acts setting it apart from the norm of murders, this aggravating circumstance is sufficiently definite to guide the sentencing body's discretion.

A similar limiting instruction must be placed upon subsection (f)(6), that "[b]y the murder, or the circumstances surrounding its commission, the defendant exhibited utter disregard for human life." To properly define this circumstance, it is important to note the other aggravating circumstances with which this provision overlaps. The second aggravating circumstance, subsection (f)(2), that the defendant committed another murder at the time this murder was committed, obviously could show an utter disregard for human life, as could the third aggravating circumstance, subsection (f)(3), that "[t]he defendant knowingly created a great risk of death to many persons." The same can be said for the fourth aggravating circumstance, subsection (f)(4), that "[t]he murder was committed for remuneration." With this in mind, since we will not presume that the legislature intended to duplicate any already enumerated circumstances, thus making subsection (f)(6) mere surplusage, *see, e. g., Norton v. Department of Employment*, 94 Idaho 924, 500 P.2d 825 (1972), we hold that the term "utter disregard" refers to acts other than those set forth in subsections (f)(2), (3) & (4); it refers to those acts which exhibit the highest, the utmost, callous disregard for human life, namely the cold-blooded, pitiless killer, such as the killer who acts randomly without motive or conscience, the killer who does not possess the normal restraints

against committing murder, but nonetheless does not do so sadistically or with torture. With such an interpretation, this aggravating circumstance meets the constitutional requirements set forth by the United States Supreme Court.

H. Finally, Osborn argues that the legislature improperly delegated the power to inflict the penalty of death to the Board of Corrections. I.C. § 19–2716 provides as follows:

> "The punishment of death must be inflicted by intravenous injection of a substance or substances in a lethal quality sufficient to cause death until the defendant is dead. The director of the department of corrections shall determine the substance or substances to be used and the procedures to be used in any execution."

This argument was disposed of in *Ex parte Granviel*, 561 S.W.2d 503, 514–15 (Tex.Cr. App.1978), as follows:

> "[T]he existence of an area for exercise of discretion by an administrative officer under delegation of authority does not render delegation unlawful where standards formulated for guidance and limited discretion, though general, are capable of reasonable application . . . .
>
> . . . .
>
> "It appears that the Legislature has declared a policy and fixed a primary standard and delegated to the said Director power to determine details so as to carry out the legislative purpose which the Legislature cannot practically or efficiently perform itself. The statute is sufficiently complete to accomplish the regulation of the particular matters falling within the Legislature's jurisdiction."

We agree with this analysis; we will not assume that the director of the Department of Corrections will act in an arbitrary and capricious manner.

### IV.

Due to the errors discussed, pursuant to I.C. § 19–2827 we remand this case for

resentencing. While § 19–2827(e)(2)[4] provides that resentencing by the trial judge shall be "based upon the record and argument of counsel," where an inadequate and improper record is one of the grounds of error upon which we reverse, the defendant's hearing shall be entirely de novo.

Reversed and remanded for resentencing.

*ADDENDUM*

Since the foregoing was written and circulated to the other members of the Court in October of last year as a proposed majority opinion,[1] research done in regard to other cases has brought my attention to the applicability of two recent United States Supreme Court decisions to III A.

## I.

Before discussing those cases, however, with regard to III E, further review has convinced me that there is merit in the Court's view that the trial court's finding by a preponderance of the evidence that Osborn "has exhibited a propensity to commit murder which will probably constitute a continuing threat to society" was not error *in this case* because of the court's later explicit statement that it was not considered as a statutory aggravating circumstance. Such does not alter the rest of my analysis under III E, however.

## II.

Two recent Supreme Court opinions—*United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), and *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981)—must be added to the discussion in III A.

## A.

In *Raddatz*, a case wherein there was far less at stake than in the case now before us, the Supreme Court stated:

"The guarantees of due process call for a 'hearing appropriate to the nature of the case.' *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The issue before us, therefore, is whether the nature of the issues presented and the interests implicated in a motion to suppress evidence require that the district

---

4. I.C. § 19–2827(e)(2) provides that this Court may:

"Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel."

1. That opinion was purposefully laid out in parts, and in subparts thereof, in order to make it convenient and expeditious for the other Justices to declare wherein they agreed and wherein they disagreed. Correctly surmising that sufficient grounds existed to necessitate a second sentencing hearing, I was not so naive as to anticipate that all members of the Court would concur across the board on those grounds which I felt required a reversal, and a second sentencing hearing. The type of format used by the author of *State v. Wagenius*, 99 Idaho 273, 282, 581 P.2d 319 (1978), and often used in major decisions by the United States Supreme Court seemed appropriate. The Chief Justice, however, apparently disagreed and in January assigned the writing of the Court's opinion to another Justice, who was already burdened with sufficient opinions to write in other significant cases. My concern here is not merely pride of authorship, but is only that there are certain types of cases which come before this Court where there are obvious compelling reasons for according those cases a priority in our deliberative and decision-making processes. One example coming readily to mind is any adoption case and, likewise, any child termination case.

Generally such cases have received preferential treatment, and I do not think that anyone would complain that such takes place. Death penalty cases, like juvenile waiver proceedings, *see Dillard v. State*, 101 Idaho 917, 623 P.2d 1294 (1981), are of a unique type where lengthy delays in the judicial process cannot be tolerated, and can lead to claims of prejudice or of cruel and inhuman punishment, especially where death row defendants are kept dangling indefinitely in appellate court processes not knowing whether they eventually will or will not be executed. The district judge performed the function required of him with alacrity, notwithstanding that absolutely no case law guidelines were available as to the interpretation and meaning of the legislative enactment it became his duty to apply. This Court, however, is open to criticism where an unduly long time will have elapsed between sentencing. And, as Justice McFadden points out, the same mandatory review remains to be done once again after resentencing has taken place, and after the briefing is done, if the death penalty is reimposed.

**434**

court judge must actually hear the challenged testimony. The core of respondent's challenge to the statute is that '[t]he one who decides must hear.' *Morgan v. United States*, 298 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288 (1936). Here, he contends, only the magistrate 'hears,' but the district court is permitted to 'decide' by reviewing the record compiled before the magistrate and making a final determination.

"In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), we emphasized that three factors should be considered in determining whether the flexible concepts of due process have been satisfied: (a) the private interests implicated; (b) the risk of an erroneous determination by reason of the process accorded and the probable value of added procedural safeguards; and (c) the public interest and administrative burdens, including costs that the additional procedures would involve." 100 S.Ct. at 2413.

Considering those three factors in order, first it is at once obvious and unneedful of further discussion that the private interest here implicated is unquestionably of the highest degree, *i. e.*, whether the defendant shall live or shall die. This consideration alone weighs so heavily that the other two considerations require but little comment in passing.

The second factor, that of the risk of an erroneous determination and the probable value of added safeguards, also weighs heavily in favor of requiring a sentencing court to hear rather than to read the testimony upon which it will base its determination. Although it could be said that the preliminary transcript in this particular case might well have been sufficient for this particular capable and experienced trial judge, the function of this Court is to follow clear and unambiguous directives of the legislature. Most judges, so I believe, would prefer not to act solely on a cold record produced at a preliminary hearing which was, as are all, conducted for an entirely different, special, and limited purpose.

The third factor, that of the public interest and administrative burden in requiring an additional hearing, is rather inconsequential, perhaps, but for certain pales in significance when measured against the other two factors. The cost of producing witnesses, probably some but not all of the same witnesses who testified at the preliminary hearing, would surely be no greater than what it would have cost to bring them to trial had Osborn not pleaded guilty—the doing of which by Osborn effected a saving to the State of Idaho, which kindness on his part should weigh in his favor in considering whether witnesses should have testified live before the sentencing judge—as against the saving of a few dollars.

The short of it is that the legislature did not anticipate that a defendant might enter a plea of guilty to first degree murder;[2]

2. In *State v. Martin*, 94 Wash.2d 1, 614 P.2d 164 (1980), the court noted that "[c]learly the legislature did not anticipate the possibility that an accused might plead guilty to a charge of first degree murder. Thus, it simply failed to provide for that eventuality." *Id.* 614 P.2d at 167. Since the Washington statutory scheme provided that the same jury which determined guilt *shall* be reconvened to determine whether the death penalty shall be imposed, and since the same trial jury cannot be "reconvened" on a plea of guilty to first degree murder, the court held that upon a plea of guilty to first degree murder a defendant could not be sentenced to death. The Washington court reaffirmed *Martin* in *State v. Frampton*, 95 Wash.2d 469, 627 P.2d 922 (1981), going on to hold that the statute was unconstitutional since it allowed the death penalty to be imposed following a

plea of not guilty and a trial but not following a plea of guilty. The Washington legislative scheme did contemplate that the sentencing authority, there the jury which decided guilt, *having heard the evidence* which established guilt, would determine the sentence. With a defendant pleading guilty, there was no jury which had heard and pondered upon the evidence.

It is rather obvious that the Idaho legislature in enacting I.C. § 19–2515(c) similarly simply did not anticipate the possibility that a defendant would plead guilty to first degree murder. I.C. § 19–2515(c) provides in part that "[i]n all cases in which the death penalty may be imposed, the court shall, after conviction, order a presentence investigation .... Evidence admitted at trial shall be considered and need not

the long of it is that the legislature may now decide for itself if the Court today correctly interprets the legislative omission to allow defendants pleading guilty to that charge to have their lives terminated by government action in the person of a judge who has not viewed the countenances, mannerisms, and voice inflections of those who recount the particulars of the crime. One might also ponder upon the extreme likelihood that at a sentencing trial, unlike the usual preliminary hearing, impeaching evidence might also be submitted.

Finally, I add only that a procedure chosen by the prosecuting attorney, even though it might not be held error because of the public defender's acquiescence therein, and the trial court's acceptance thereof, does not ipso facto meet the statutory requirement, the exact fulfillment of which is necessarily placed before this five-member tribunal for review as to compliance. Although it is plainly to be seen that I.C. § 19–2515(c) does provide that the sentencing court is to receive "all relevant evidence . . . in aggravation and mitigation" (which I submit would be the case even absent that phrase), nothing therein approaches the dignity of impliedly negating the clear mandate of I.C. § 19–2516 that the sentencing court hear of the circumstances of the crime only from "witnesses examined in open court" other than, as under I.C. § 19–2515(c), where the sentencing judge has already heard the testimony at trial.

### B.

In *Estelle v. Smith, supra,* the United States Supreme Court held that use of psychiatric testimony, obtained without warning defendant that he had the right to remain silent and that what he told the psychiatrist could be used against him, in the sentencing phase of a capital case violated both the Fifth and Sixth Amendments. In that case Dr. Grigson examined defendant to determine whether he was competent to stand trial. Subsequently, after defendant was convicted of murder, the state used Dr. Grigson as a witness to establish that there was a probability that defendant "would commit criminal acts of violence that would constitute a continuing threat to society." The Supreme Court held as follows:

> "We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees . . . . Any effort by the State to compel respondent to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment. Yet the State's attempt to establish respondent's future dangerousness by relying on the unwarned statements he made to Dr. Grigson similarly infringes Fifth Amendment values.
>
> . . . .
>
> "Dr. Grigson's prognosis as to future dangerousness rested on statements respondent made, and remarks he omitted, in reciting the details of the crime. The Fifth Amendment privilege, therefore, is directly involved here because the State used as evidence against respondent the substance of his disclosures during the pretrial psychiatric examination.

---

be repeated at the sentencing hearing." These provisions contemplate that the same body which heard the evidence at trial shall decide whether the death penalty shall be imposed; evidence presented at trial need not be repeated because the court, as the sentencing body, has already heard that evidence. Although, unlike in Washington, it is unnecessary to invalidate the Idaho statutory scheme because of this failing, it does further substantiate my view that it was error for the trial court to rely on the preliminary hearing transcript; the Idaho statutory scheme mandates that the sentencing authority hear the testimony that would have been produced at trial had there been a trial, and clearly the Court goes awry in failing to require absolute compliance in what is generally accepted as a matter of some seriousness.

It should be noted in connection with this unique problem that some states refuse a plea of guilty in a capital case. *See, e. g.,* La.Code Crim.Pro.Ann. art. 557; N.J.Stat.Ann. § 2A:113–3 (repealed 1979 along with the death penalty); N.Y.Crim.Proc. § 220.10(5)(e).

. . . .

"[T]he interview with Dr. Grigson cannot be characterized as a routine competency examination restricted to ensuring that respondent understood the charges against him and was capable of assisting in his defense. Indeed, if the application of Dr. Grigson's findings had been confined to serving that function, no Fifth Amendment issue would have arisen.

. . . .

"Respondent . . . introduced no psychiatric evidence, nor had he indicated that he might do so. Instead, the State offered information obtained from the court-ordered competency examination as affirmative evidence to persuade the jury to return a sentence of death . . . . To meet its burden, the State used respondent's own statements, unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty. In these distinct circumstances, the Court of Appeals correctly concluded that the Fifth Amendment privilege was implicated.

. . . .

"The consideration calling for the accused to be warned prior to custodial interrogation [under *Miranda*] apply with no less force to the pretrial psychiatric examination at issue here . . . . When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a post-arrest custodial setting . . . . Yet [Estelle] was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him.

. . . .

"A criminal defendant, who neither initiates a psychiatric evaluation nor at-tempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding . . . . If, upon being adequately warned, respondent had indicated that he would not answer Dr. Grigson's questions, the validly ordered competency examination nevertheless could have proceeded upon the condition that the results would be applied solely for that purpose

. . . .

"[W]e must conclude that, when faced while in custody with a court-ordered psychiatric inquiry, respondent's statements to Dr. Grigson were not 'given freely and voluntarily without any compelling influences' and, as such, could be used as the State did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them . . . . These safeguards of the Fifth Amendment privilege were not afforded respondent and, thus, his death sentence cannot stand.

"When respondent was examined by Dr. Grigson, he already had been indicted and an attorney had been appointed to represent him . . . . [H]e had a Sixth Amendment right to the assistance of counsel before submitting to the pretrial psychiatric interview . . . .

. . . .

"Therefore, in addition to Fifth Amendment considerations, the death penalty was improperly imposed on respondent because the psychiatric examination on which Dr. Grigson testified at the penalty phase proceeded in violation of respondent's Sixth Amendment right to the assistance of counsel." 451 U.S. at 454–471, 101 S.Ct. at 1873–1877.

In the present case, the trial court in its memorandum decision stated "[p]rior evaluations and the evaluation by Dr. Reichman indicate that the defendant has an anti-social personality." Thus the trial court did utilize this psychiatric evaluation in the sentencing phase of Osborn's trial. Although Osborn voluntarily underwent this examination, he did so only for the purposes of determining the competency to stand trial and competency at the time of the act

charged. At no time was Osborn warned that the state might at his sentencing hearing make use of statements made at the psychiatric examination, nor did Osborn consent to such use of his own statements.

Furthermore, Osborn withdrew his claim of mental defect precluding responsibility when he withdrew his plea of not guilty. It would seem to follow that the psychiatric report could not from that point on be classified as voluntarily given and available for all purposes, especially the purpose of sentencing.

The question then is whether evidence gained as a result of this examination was improperly used to establish an aggravating circumstance, as viewed in light of the statements excerpted from *Estelle.* Since we are remanding for resentencing, it is perhaps unnecessary that the Court now decide this question, and I raise the point only so that the district court may give consideration to the possibility of excluding evidence, the admission of which may necessitate a second remand for resentencing. In this regard it should also be noted that the Supreme Court's considerations in *Estelle* could also apply to the use of presentence reports where the presentence investigator may incorporate a defendant's own written statement of the criminal conduct, or a report of a defendant's oral statements thereof, without proper observance of Fifth and Sixth Amendment rights.